<u>NOT FOR PUBLICATION</u>                                    (Doc. Nos. 8, 11)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                          :
LANCE BOBO,                               :
                                          :
                           Plaintiff,     :        Civil No. 13-5007 (RBK/KMW)
                                          :
                v.                        :        **OPINION**
                                          :
                                          :
WILDWOOD PUBLIC SCHOOLS                    :
BOARD OF EDUCATION, et al.                 :
                                          :
                           Defendants.    :
_____  :

**KUGLER**, United States District Judge:

In this case, Plaintiff Lance Bobo ("Plaintiff") asserts violations of his constitutionally

protected rights, actionable under 42 U.S.C. §§ 1983 and 1985, a <u>Pierce</u> common law wrongful

discharge claim, a claim under the Conscientious Employee Protection Act ("CEPA"), N.J. Stat.

Ann. §§ 34:19-1 <u>et seq.</u>, and a claim of disability discrimination under the New Jersey Law

Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 <u>et seq.</u>, against the Wildwood

Public Schools Board of Education ("Defendant Board"), Patrick Quinlan ("Defendant

Quinlan"), Gregory Rohrman ("Defendant Rohrman"), and Dennis Anderson ("Defendant

Anderson") (collectively "Defendants").

Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint

pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. No. 8).  For the reasons stated herein, Defendants'

Motion will be granted in part and denied in part.

### I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff was employed by the Board as a custodian beginning in August 2005. (Amended Complaint ("Compl.") ¶ 1.)  In November of that year, Plaintiff complained to his supervisor, Defendant Quinlan, that "certain records regarding the boilers in the school were being falsified."  (Id. ¶ 2.)  Plaintiff specifically complained that he had been listed "as having trained another employee on the procedures for checking boilers when in fact he had not . . . ."  (Id.)   After Plaintiff complained, Defendant Quinlan "became upset."  (Id. ¶ 5.)  Not only did Defendant Quinlan start complaining about Plaintiff's work performance, but he also assigned Plaintiff to perform "additional tasks that his co-workers were not made to perform."  (Id.)

It is Plaintiff's belief that Defendant Quinlan prepared, had knowledge of, or acquiesced to the false information being included on the forms.  (Id. ¶ 3.)  Further, Plaintiff believes that the forms were utilized in order that an employee could provide proof of the requisite training to qualify for a Black Seal Boiler License.  (Id. ¶ 4.)  After Defendant Quinlan failed to address Plaintiff's complaint, Plaintiff reported the falsification of the boiler training documents to Defendant Rohrman, the Business Administrator/Board Secretary.  (Id. ¶ 6.)  Subsequently, Plaintiff reported the falsification of the documents to Defendant Anderson, Superintendent of the Wildwood Public Schools.  (Id. ¶ 8.)  Plaintiff believes the falsification of these training documents continued for years thereafter, up to the time of Plaintiff's termination.  (Id. ¶ 7.)  He also alleges that over the next few years, Defendant Quinlan "constantly harassed Plaintiff about his work, threatening his job."  (Id. ¶ 9.)  Although Plaintiff sought "whistleblower protection"

---

[1] On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the Plaintiff."  Accordingly, the following facts are taken from Plaintiff's Amended Complaint.  See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

from the Human Resources Department in 2010, to protect Plaintiff against the retaliation of Defendant Quinlan, he was "denied any protection." (Id. ¶ 15.)

Plaintiff first complained about the alleged "mismanagement of funds" by Defendant Quinlan in a union meeting, particularly that Defendant Quinlan was failing to "set the schedule of maintenance workers in such a way that would reduce the need to continually pay certain workers overtime." (Id. ¶ 10.)  He also complained that certain work was being performed by individuals who did not hold a "Black Seal license," which was required, and that Defendant Quinlan was "dumping waste illegally." (Id. ¶¶ 11-12.)  In fact, Plaintiff had refused Defendant Quinlan's direction to dump cleaning chemicals and other waster into the sewer system. (Id. ¶ 12.)  In 2010 Plaintiff complained about the actions of Defendant Quinlan, including the falsification of boiler training documents, the mismanagement of funds, and "illegal waste issues" to Defendant Anderson and Director of Human Resources, Russ Heaton. (Id. ¶ 14.)

During 2010 Plaintiff also reported the actions of a co-worker who allegedly acted in an inappropriate manner toward students. (Id. ¶¶ 13, 16.)  That co-worker allegedly sniffed the body of one student and massaged the shoulders of two other students. (Id. ¶ 13.)  Plaintiff apparently reported the actions of this co-worker to Defendants Anderson and Rohrman. (Id. ¶ 16.)  After reporting the co-worker's activity, Plaintiff was accused of harassing the co-worker whom he reported. (Id. ¶ 17.)  Plaintiff claims Defendant Anderson instructed him to stop making allegations against his co-worker in August 2010. (Id.)  Because no action was being taken by Defendants with respect to the actions of Plaintiff's co-worker, Plaintiff reported the co-worker to the Cape May County Prosecutor's Office, believing his co-worker's actions posed a risk to the safety of the children in the school district. (Id. ¶ 18.)  Then, in December 2010 and

January 2011, Defendant Rohrman warned Plaintiff not to speak to anyone concerning his accusations against his co-worker, or Plaintiff would be subject to discipline.  (Id. ¶ 20.)

Additionally, because none of the matters reported to officials working for the Wildwood School District were apparently being resolved, including the falsification of boiler training documents, the mismanagement of funds, and the illegal dumping of waste, Plaintiff reported these issues to the Cape May County Superintendent's Office and the New Jersey Office of Fiscal Accountability and Compliance.  (Id. ¶ 19.)  Plaintiff also claims he reported the falsification of training documents and the illegal dumping issues to "the Prosecutor's Office," at some point.  (Id. ¶ 21.)

Sometime around December 2010 Defendant Quinlan began "issuing Disciplinary Notices to Plaintiff for allegedly not completing tasks required of him," despite the fact that Plaintiff had been "performing his job duties thoroughly."  (Id. ¶ 22.)  In retaliation for his numerous complaints, Plaintiff alleges that he was transferred to different schools, and Defendant Quinlan continued to harass him.  (Id. ¶¶ 23.)[2]

Plaintiff avers that due to the retaliatory and harassing behavior of Defendant Quinlan, he suffered emotional distress and elevated blood pressure, which led to a "sudden change in Plaintiff's physical appearance."  (Id. ¶ 24.)  Meanwhile, Defendant Quinlan allegedly "bragged to other workers that he had elevated Plaintiff's blood pressure and made him turn red in the face."  (Id. ¶ 25.)

In December 2011 Plaintiff left work after the school nurse confirmed that his blood pressure was highly elevated.  (Id. ¶ 26.)  Plaintiff sought medical treatment and was out of work

---

[2] The Amended Complaint does not identify who ordered Plaintiff's transfer to different schools.

for five days.  (Id.)  That same month, Plaintiff advised "Defendants[3] that he was unable to report to work due to 'stress induced headaches.'"  (Id. ¶ 27.)  In response, Defendant Rohrman sent Plaintiff a notice dated December 9, 2011, advising Plaintiff that he was "suspended with pay … pending the results of a fitness for duty evaluation."  (Id. ¶ 28.)  Plaintiff was then directed to undergo a psychiatric evaluation by Defendant Rohrman, which he claims was retaliation for requesting a brief medical leave of absence, and in further retaliation for Plaintiff's prior complaints regarding the falsification of boiler training documents, illegal waste dumping, and inappropriate behavior toward students.  (Id. ¶ 29.)

Upon Plaintiff's return to work, Defendant Quinlan allegedly continued to harass Plaintiff and issue him "bogus" disciplinary actions.  (Id. ¶ 30.)  Plaintiff again complained to Defendant Rohrman in December 2011 that Defendant Quinlan had been harassing him for his prior reporting activities.  (Id. ¶ 31.)  Subsequently, Defendants Quinlan and Rohrman recommended Plaintiff's termination to Defendant Anderson.  (Id. ¶ 32.)  Defendant Anderson then recommended Plaintiff's termination to Defendant Board.  (Id. ¶ 33.)  On February 21, 2012, "[Defendant] Rohrman notified Plaintiff [by letter] that he was terminated effective in thirty (30) days."  (Id.)

On February 20, 2013, Plaintiff filed an action against the Defendants in the Superior Court of New Jersey, Law Division, Cape May County, Docket No. CPM-L-87-13.  (Doc. No. 1.)  On August 21, 2013, Defendants filed a Notice of Removal pursuant to 28 U.S.C. § 1441(a) and (b), invoking this Court's jurisdiction under 28 U.S.C. § 1331.  (Id.)  On September 20, 2013, Defendants filed their first Motion to Dismiss Plaintiff's claims pursuant to Fed. R. Civ. P.

---

[3] Plaintiff does not identify any one individual.

12(b)(6).  (Doc. No. 2.)  This Court granted Defendants' Motion to Dismiss on May 28, 2014, and gave Plaintiff fourteen days to file an Amended Complaint.  (Doc. No. 6.)

Plaintiff filed an Amended Complaint on June 10, 2014.  (Doc. No. 7.)[4]  In his Amended Complaint, Plaintiff alleged the following claims against all Defendants: claims pursuant to 42 U.S.C. §§ 1983 and 1985 for violations of his "First Amendment rights to Free Speech and the Right to Petition guaranteed by the New Jersey and United States Constitutions," (Count I); a common law claim for wrongful discharge pursuant to Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980) (Count II); a claim under the Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. §§ 34:19-1 et seq. (Count III); and a claim of disability discrimination under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 et seq. (Count IV).

Defendants filed this present Motion to Dismiss the Amended Complaint on July 15, 2014.[5]  As this motion has been briefed, the Court now turns to the parties' arguments.

---

[4] While Plaintiff did not file a motion for leave to amend, but only filed an Amended Complaint on June 10, 2014, the Court considers that by the terms of its Order of May 28, 2014, Plaintiff was already granted leave to amend his Complaint.  Accordingly, the Court considers Plaintiff's Amended Complaint operative and will address Defendants' Motion to Dismiss as a matter of course.

[5] Plaintiff has argued that Defendants' Motion to Dismiss the Amended Complaint was untimely, and asks this Court to deny Defendants' present Motion with prejudice.  (Doc. No. 9.)  Defendants argued, mistakenly, that Plaintiff's Amended Complaint should have been treated as an initial complaint where service was already accepted, giving them 60 days to file responsive papers pursuant to Fed. R. Civ. P. 12(a)(1)(A)(ii).  (Doc. No. 10.)  However, Defendants also requested an extension of time to answer or otherwise move pursuant to Fed. R. Civ. P. 6(b)(1)(B).  (Doc. No. 11.)

The Court has discretion to allow Defendants to file an answer or response out-of-time "upon a showing of good cause."  Catanzaro v. Fischer, 570 Fed. App'x 162, 166 (3d Cir. 2014) (citing Fed. R. Civ. P. 6(b)(1)).  After the time to file a motion for an extension of time has expired, the Court must make a finding that the party's failure to file a timely response was due to "excusable neglect."  Id. at 6(b)(1)(B); Drippe v. Tobelinski, 604 F.3d 778, 785 (3d Cir. 2010).  In making such a finding the court accounts for "all relevant circumstances surrounding the party's omission," including the danger of prejudice to the opposing party, the length of the delay in responding and its potential impact on judicial proceedings, "the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."  Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).  Based on the circumstances in this case, the Court finds that there was "excusable neglect."

First, it does not appear that Plaintiff would suffer any prejudice by granting Defendants' Motion for an Extension of Time.  Plaintiff has failed to put forth such an argument in his opposition to Defendants' Motion for an Extension of Time, (see Doc. No. 12), and the Court notes that both parties have subsequently requested extensions of time to file

## II.   LEGAL STANDARD

Rule 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).  In other words, a complaint is sufficient if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  It is not for courts to decide at this point whether the moving party will succeed on the merits, but "whether they should be afforded an opportunity to offer evidence in support of their claims."  In re Rockefeller Ctr. Prop., Inc., 311

---

briefs, both requests have been granted, and this matter has been fully briefed by each party.  (See Doc. Nos. 13-15, 18-19.)  Nor does Defendants' delay weigh heavily against them.  While they filed twenty one days after their responsive papers were due, they only filed thirty five days after Plaintiff filed the Amended Complaint, which was nearly ten months after Defendants removed this case to Federal Court, and nearly fourteen months after Plaintiff filed his original Complaint in state court.  With no evidence that relevant materials or witnesses were lost, that a trial date was significantly postponed, that Plaintiff had to expend considerably more time or effort responding to the present motion, or that either party gained an advantage through Defendants' late filing, it cannot be said that there would be a significant impact on these judicial proceedings.

Finally, the Court finds that Defendants' purported reason for the late filing, misunderstanding the nature of Plaintiff's Amended Complaint, was reasonable under the circumstances.  The record indicates that this case was "Closed" by the Clerk after this Court's May 28 Order.  While the Order explicitly granted Plaintiff fourteen days to file an "Amended Complaint," Defendants could be excused for misunderstanding the docket notation and presuming that Plaintiff was in fact filing an initial complaint, particularly because Plaintiff did not first file a motion for leave to amend his Amended Complaint.  It does not appear that Defendants were acting in bad faith, only that they were mistaken regarding which Federal Rule of Civil Procedure governed their time to file responsive papers, which they continued to argue in their Motion for an Extension.  (See Doc. No. 11, Michael A. Pattanite Certification ¶¶ 11, 16; see also Doc. No. 10.)  Instead, Defendants filed within what they believed was their allotted sixty day window, and as soon as Plaintiff brought the timeliness issue to Defendants' attention they responded the next day with a letter explaining their position and a Motion for an Extension of Time in the alternative.  Based on the lack of prejudice to Plaintiff, the lack of impact on these proceedings, and Defendants apparent good faith, albeit mistaken, view of the Federal Rules, this Court finds that Defendants have shown "excusable neglect," and will grant Defendants' Motion for an Extension of Time.

F.3d 198, 215 (3d Cir. 2002).  Yet, while "detailed factual allegations" are not necessary, a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  Twombly, 550 U.S. at 555; see also Iqbal, 556 U.S. at 678-79.

To determine whether a complaint is plausible on its face, courts conduct a three-part analysis.  Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Id. (quoting Iqbal, 556 U.S. at 675).  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Id. at 131 (quoting Iqbal, 556 U.S. at 680).  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Id. (quoting Iqbal, 556 U.S. at 680).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible.  Id.

In considering a Rule 12(b)(6) motion to dismiss, a court may consider only the allegations of the complaint, documents attached or specifically referenced in the complaint if the claims are based on those documents, and matters of public record.  In re Bayside Prison Litig., 190 F. Supp. 2d 755, 760 (D.N.J. 2002).  See also Winer Family Trust v. Queen, 503 F.3d 319, 327 (3d Cir. 2007).  If "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  The court has discretion to either convert a motion to dismiss into a motion for summary judgment, or to ignore the matters presented outside the pleadings and continue to treat

the filing as a motion to dismiss.  Kurdyla v. Pinkerton Sec., 197 F.R.D. 128, 131 (D.N.J. 2000).

The court should not convert a motion to dismiss into a motion for summary judgment when

little discovery has taken place.  Id. at 131, 131 n.8.  As a preliminary matter, this Court notes

that Defendants improperly attached an exhibit of "investigative documents" in an apparent

attempt to dispute some of Plaintiff's contentions in his Amended Complaint, (see Ex. A to

Def.'s Br.), and Plaintiff attached a certification in an apparent further attempt to dispute the

arguments asserted by Defendants based on their exhibit.  (See Pl.'s Opp'n, Cert. of Patrick

Rudden.) The Court declines to treat this motion as a motion for summary judgment, and will

disregard Defendants' exhibit and Plaintiff's certification in deciding this Motion to Dismiss.

## III.    DISCUSSION

### A.    Plaintiff's Claims Under 42 U.S.C. §§ 1983 and 1985 (Count I)

Plaintiff alleges that Defendants deprived him of his constitutionally protected rights to

Free Speech and the Right to Petition guaranteed by the United States and New Jersey

Constitutions while acting under color of state law, and in violation of 42 U.S.C. §§1983 and

1985.

With respect to Plaintiff's section 1983 claim, a plaintiff may have a cause of action

under 42 U.S.C. § 1983 for certain violations of his or her constitutional rights.  Section 1983

provides in relevant part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory . . . subjects,
> or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

Thus, to establish a violation of section 1983, a plaintiff must demonstrate that the challenged conduct was committed by (1) a person acting under color of state law, and (2) that the conduct deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States.  See Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994). While Plaintiff claims that all Defendants violated his constitutional rights, the Court will address his § 1983 claims against the Board and the individual Defendants separately.

Finally, the Court notes that Plaintiff's section 1985 claims are predicated on the existence of a conspiracy.  See United Bhd. of Carpenters and Joiners v. Scott, 463 U.S. 825, 828-29 (1983) ("to make out a violation of § 1985(3), the plaintiff must allege and prove four elements," which include "a conspiracy"); Heffernan v. Hunter, 189 F.3d 405, 411 (3d Cir. 1999) ("section 1985(1) and 1985(2) claims require a conspiracy").  To survive a motion to dismiss, a plaintiff must assert: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."  Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2005) (citing United Bhd. of Carpenters, 463 U.S. at 828-29).

Plaintiff has offered no information to support his contention that Defendants were part of a conspiracy.  "[A]llegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."  Capogrosso v. The Supreme Court of New Jersey, 588 F.3d 180, 185 (3d Cir. 2009) (citing Crabtree v. Muchmore, 904 F.2d 1475, 1481 (10th Cir. 1990)).  Plaintiff's Amended Complaint is devoid of any mention of an agreement, any facts suggesting concerted action, or any other allegations of a conspiracy

other than his bare assertion that "[Defendants] acted in concert and collusion for the unlawful purpose of depriving Plaintiff of his Constitutional rights." (Compl. ¶ 38.) Accordingly, the Court will grant Defendants' Motion to Dismiss Plaintiff's claim for conspiracy to violate Plaintiff's civil rights under § 1985, and that portion of Count I will be dismissed from the Amended Complaint.

### 1.      Plaintiff's § 1983 Claim against Defendant Board

In contrast to the concept of individual liability, a local government entity, including a school board, may be held liable under § 1983 for a constitutional violation if the violation occurred as a result of a policy or custom established or approved by that entity. C.H. v. Oliva, 226 F.3d 198, 202 (3d Cir. 2000) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978)). The policy or custom must also have been the proximate cause of the constitutional violation. Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996). "If the policy or custom does not facially violate federal law, causation can be established only by demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequences . . . . A showing of simple or even heightened negligence will not suffice." Chambers v. Sch. Dist. of Philadelphia, 587 F.3d 176, 193 (3d Cir. 2009).

In the context of municipal liability under § 1983, a policy is an "official proclamation, policy, or edict" made by "a decisionmaker with final authority" to do so. Beck, 89 F.3d at 971 (internal quotations and citations omitted). In contrast, a custom is "a course of conduct . . . though not authorized by law . . . [that] is so permanent and well-settled as to virtually constitute law." Id. A custom "may also be established by evidence of knowledge and acquiescence." Id.

The Third Circuit has held that there are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007) (quoting Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003)).

As with a policymaker's failure to act under circumstances that exhibit a deliberate indifference to constitutional rights, municipal entities may be similarly liable under § 1983 if they fail to train their employees or personnel, and such failure exhibits a "deliberate indifference to the rights of persons" with whom they come into contact. Simmons v. City of Philadelphia, 947 F.2d 1042, 1060 (3d Cir. 1991) (citing City of Canton v. Harris, 489 U.S. 378 (1989)); see also id. at 387 (noting "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983.") "Municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 407 (1997) (quotation omitted). "In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training . . . is the moving force behind the plaintiff's injury." Id. at 407-08.

Here, Plaintiff has not identified any policy or custom that caused his injuries, nor has he set forth any factual allegations that would support a § 1983 claim premised on a failure to train. As with his § 1985 claims, Plaintiff has only offered the bare assertion that "Defendant [Board] failed to properly train its Administration and employees concerning the proper procedure for taking, investigating, and resolving complaints of employees concerning serious issues." (Compl. ¶ 36.)  None of the facts in Plaintiff's Amended Complaint support this contention. Plaintiff has alleged nothing to suggest that a deficient training program existed, that the Board was on notice that a new training program was necessary, or that the Board continued adhering to an approach to training which they knew, or should have known, had failed to prevent tortious conduct by employees in the past.  See Bd. of Cnty. Comm'rs, 520 U.S. at 407.  In light of Plaintiff's mere conclusory allegation that Defendant Board failed to train its employees, Defendants' Motion to Dismiss Plaintiff's § 1983 claim against Defendant Board will be granted, and that portion of Count I will be dismissed from the Amended Complaint.

### 2.    Plaintiff's § 1983 Claim against the Individual Defendants

Plaintiff also seeks to hold Defendants Anderson, Rohrman, and Quinlan liable under § 1983, alleging their actions in terminating Plaintiff in retaliation for his complaints were in violation of his First Amendment rights.  See U.S. Const. amend. I.[6]  "A public employee has a

---

[6] Plaintiff claims Defendants violated his right to Free Speech and his Right to Petition.  (Compl. ¶ 35.)  While this claim potentially encompasses two distinct rights under the First Amendment, that Plaintiff has only alleged that Defendants retaliated against him for engaging in protected speech.  (See id. ¶ 37.)  To the extent that Plaintiff states a claim under the First Amendment, the Court construes it as encompassing a First Amendment retaliation claim. See McKee v. Hart, 436 F.3d 165, 169 (3d Cir. 2006) ("[I]n certain circumstances, a public employee may bring a cause of action alleging that his or her First Amendment rights were violated by retaliatory harassment for the employee's speech about a matter of public concern even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment.") (citing Suppan v. Dadonna, 203 F.3d 228, 234–35 (3d Cir. 2000)).  To state a claim under the Petition Clause of the First Amendment, Plaintiff would need to assert that Defendants retaliated against Plaintiff for filing an actual lawsuit, which he has not done.  See Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003) (citing San Filippo v. Bongiovanni, 30 F.3d 424, 434-35 (3d Cir. 1994)).

constitutional right to speak on matters of public concern without fear of retaliation." <u>Baldassare v. New Jersey</u>, 250 F.3d 188, 194 (3d Cir. 2001) (citations omitted).

In order to properly state a First Amendment retaliation claim, and survive a motion to dismiss, "a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241 (3d Cir. 2006) (citing <u>Phyllis Hill v. City of Scranton</u>, 411 F.3d 118, 125 (3d Cir. 2005)). "The first factor is a question of law; the second factor is a question of fact." <u>Borough of Kutztown</u>, 455 F.3d at 241 (citing <u>Curinga v. City of Clairton</u>, 357 F.3d 305, 310 (3d Cir.2004)).

Plaintiff can prove that his speech was protected activity by showing that: (1) in making it, Plaintiff spoke as a citizen, (2) the statement involved a matter of public concern, and (3) Plaintiff's employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made. <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006). Plaintiff did not speak "as a citizen" if he made a statement "pursuant to [his] official duties." <u>Id.</u> at 421. Additionally, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." <u>Rankin v. McPherson</u>, 483 U.S. 378, 384 (1987) (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 147-148 (1983)).

Plaintiff's Amended Complaint does not indicate whether his various reports and complaints were part of his official duties, so the Court will read the Amended Complaint to allege that he was speaking as a citizen. <u>See</u> <u>Borough of Kutztown</u>, 455 F.3d at 242 (noting the deferential standard applied on a Rule 12(b)(6) motion). Nor can the Court determine, without further development of the record, whether the putative "protected speech"—allegations of

14

falsification of training documents, mismanagement of funds, illegal waste dumping and the improper touching of a student by a school employee—involved a matter of public concern.  See Brennan, 350 F.3d at 412 ("A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community. … [S]peech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.") (internal quotation marks and citations omitted) (citing Baldassare, 350 F.3d at 195; Connick, 461 U.S. at 148).[7]  Based only on the allegations in the Amended Complaint, the Court finds that these issues could all properly be considered matters of public concern.[8]  Similarly, the Court cannot resolve at this time whether any of the individual Defendants "had an adequate justification for treating the employee differently from any other member of the general public" by restricting Plaintiff's speech.  Garcetti, 547 U.S. at 418.  For these reasons, the Court finds that Plaintiff has adequately pleaded his speech was protected by the First Amendment.  See Borough of Kutztown, 455 F.3d at 241.[9]

---

[7] However, to the extent that Plaintiff wishes to rely on his allegations concerning seeking "whistleblower protection" against Defendant Quinlan, (see Compl. ¶ 15), advising Defendants that he could not report to work due to "stress-induced headaches" in December 2011, (see id. ¶ 27), and complaining to Defendant Rohrman about Defendant Quinlan's alleged harassment in December 2011, (see id. ¶ 30), the Court finds that these are not evidently matters of public concern.  Rather, these issues appear to involve Plaintiff's private concerns, as they solely relate to Plaintiff's personal grievances and issues in the workplace.  See Brennan, 350 F.3d at 412 ("If the speech in question is purely personal, it does not fall under the protective umbrella of the First Amendment and public employers are therefore not limited by that guarantee in responding to disruption caused by the expression.") (citing Connick, 461 U.S. 138).  There is no indication that these issues relate to "any matter of political, social or other concern in the community," and thus the Court will not consider them for purpose of this claim.  Baldassare, 250 F.3d at 195.

[8] See also infra at Part III.B for discussion of violations of public policy under the Pierce framework, which include similar considerations.

[9] Defendants assert that the defense of qualified immunity necessitates the dismissal of Plaintiff's § 1983 and § 1985 claims, which may be considered on a motion to dismiss.  See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.")  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Ray v. Twp.

Next, the Court addresses whether Plaintiff has sufficiently alleged that his protected conduct was a substantial factor in the supposed retaliatory action.  See id.; see also Brennan, 350 F.3d at 414.  The essence of Plaintiff's constitutional claim is that Defendants Quinlan, Rohrman, and Anderson engaged in various forms of conduct in retaliation for his filing complaints concerning the falsification of boiler training documents, the mismanagement of funds, the illegal dumping of waste, and the inappropriate actions of Plaintiff's co-worker with respect to three female students.

### a.    Plaintiff's § 1983 Claim against Defendant Anderson

The primary factual contention in the Amended Complaint ostensibly connecting Defendant Anderson to Plaintiff's alleged constitutional violations relates to Defendant Anderson's recommendation to Defendant Board that Plaintiff be terminated in early 2012.  (See Compl. ¶ 33.)  Though he alleges that Defendant Anderson also warned Plaintiff in 2010 to stop making allegations against his co-worker, (see id. ¶ 17),[10] there is no apparent connection between this warning and Defendant Anderson's decision to recommend Plaintiff's termination. Nearly one and one-half years had passed since this alleged warning, and Plaintiff specifically

---

of Warren, 626 F.3d 170, 173 (3d Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223 (2009)).  If a reasonable state actor is not on notice that his or her conduct under the circumstances is clearly unlawful, then application of qualified immunity is appropriate.  Id.  "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  Id.

The Supreme Court has established a two-part analysis to determine if qualified immunity is appropriate:  (1) whether the official's conduct violated a constitutional or federal right; and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  Pearson, 555 U.S. at 232.  Because it appears that the federal right Plaintiff contends was violated was clearly established, the Court declines to conclude at this time that the Defendants are entitled to qualified immunity as a matter of law.  See Baldassare, 250 F.3d at 201 (citing cases).

[10] As the only such warning coming from Defendant Anderson alleged by Plaintiff, the Court finds that this alone was at most a de minimis retaliatory act, if it were even considered such an act, akin to a verbal reprimand or criticism.  See Brennan, 350 F.3d at 419 (Noting that "courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands.")

contends that his reporting of Defendant Quinlan's retaliatory conduct for Plaintiff's complaints regarding the falsification of training documents and illegal waste dumping to Defendant Rohrman precipitated the decision to terminate him.  (See id. ¶¶ 31-32; see also Brennan, 350 F.3d at 420 (noting that where a significant delay exists between the expressive activity and the retaliation, Plaintiff must demonstrate continuing hostility to connect otherwise seemingly unrelated events).)  Plaintiff offers no other facts connecting Defendant Anderson's decision to recommend Plaintiff's termination and Plaintiff's protected conduct.  See id. ("Although the nine month gap here between expression and alleged retaliation is not, by itself, sufficient to preclude an inference of causation, there is nothing other than [Plaintiff's] claim of causation to connect the two.")  In fact, Plaintiff presents no information suggesting Defendant Anderson was aware of any ill motive behind Defendants Quinlan's and Rohrman's decision to recommend his termination to Defendant Anderson in the first place.  (See id. ¶¶ 31-33.)

Notably, Plaintiff also alleges that he had been repeatedly reported the falsification of training documents, mismanagement of funds, illegal waste disposal, and co-worker behavior issues from as early as November 2005.  (See id. ¶¶ 3, 8, 14, 16.)  Despite his numerous reports during the nearly six and one-half years covered in Plaintiff's Amended Complaint,  Plaintiff has failed to allege facts suggesting that Defendant Anderson engaged in any retaliatory conduct as a result of Plaintiff's protected activities.  Even drawing all possible inferences in Plaintiff's favor, the Court does not find that he adequately pleaded a § 1983 claim against Defendant Anderson. As such, Defendants' Motion to Dismiss Plaintiff's § 1983 claim as it relates to Defendant Anderson will be granted, and that claim against Defendant Anderson in Count I will be dismissed from the Amended Complaint.

### b.    Plaintiff's § 1983 Claim against Defendants Rohrman and Quinlan

Plaintiff sets forth several allegations pertaining to Defendant Quinlan's alleged retaliatory conduct.  He contends that Defendant Quinlan began retaliating against Plaintiff for his complaints about the falsification of boiler training documents soon after Plaintiff first reported the issue to Quinlan in November 2005, (see id. ¶ 5), and Defendant Quinlan's harassment continued for years.  (Id. ¶¶ 9, 15.)  In December 2010 Defendant Quinlan also allegedly began issuing disciplinary notices to Plaintiff for failing to perform tasks, despite the fact Plaintiff "had performed his job thoroughly,"  (id. ¶ 22), and continued to retaliate against Plaintiff for his various complaints via "harassment."  (Id. ¶ 23.)  Plaintiff also claims that when he returned to work from his brief medical absence in December 2011, Defendant Quinlan continued to harass Plaintiff, and issued him "bogus disciplinary actions."  (Id. ¶ 30.)  Finally, Plaintiff states that Defendants Quinlan and Rohrman recommended Plaintiff's termination after Plaintiff once more reported Defendant Quinlan's retaliatory conduct.  (See id. ¶¶ 31-32.)  The Court finds one could reasonably infer that the alleged harassment of Plaintiff, the issuance of unfounded disciplinary notices, and the recommendation to terminate Plaintiff from his job, all made at the hand of Defendant Quinlan, were motivated by Plaintiff's protected conduct. Therefore, the Court concludes that Plaintiff has sufficiently pleaded a § 1983 claim for First Amendment retaliation against Defendant Quinlan, and Defendants' Motion to Dismiss that portion of Count I of Plaintiff's Amended Complaint will be denied.

Plaintiff has far fewer allegations pertaining to Defendant Rohrman, but the Court considers them sufficient to state a claim for retaliation.  In his Amended Complaint Plaintiff alleges that in December 2010 and January 2011 Defendant Rohrman "warned Plaintiff not to speak to anyone of [Plaintiff's] accusations against his co-worker again or he would be subject to

discipline." (Id. ¶ 20.)  Later, in December 2011, Plaintiff alleges Defendant Rohrman directed Plaintiff to undergo a psychiatric evaluation after Plaintiff advised Defendants he was unable to report to work due to "stress-induced headaches."  (Id. ¶¶ 27-29.)  Plaintiff claims Defendant Rohrman "forwarded a notice dated December 9, 2011 advising Plaintiff that he was 'suspended without pay … pending the results of a fitness for duty evaluation.'"  (Id. ¶ 28.)  He also claims that Defendant Rohrman's requirement that Plaintiff undergo a psychiatric evaluation was in retaliation for not only "requesting a brief medical leave of absence," but also "in further retaliation for making the complaints regarding the falsification of boiler training documents, illegal waste dumping and inappropriate behavior toward students."  (Id. ¶ 29.)  While more thread-bare than Plaintiff's claim against Defendant Quinlan, the Court finds Plaintiff's allegation concerning the initial threat by Defendant Rohrman sufficient to support the later inference that Defendant's Rohrman's decision to order a psychiatric evaluation was retaliatory in motive.  Plaintiff also asserts that he complained to Defendant Rohrman in December 2011 about Defendant Quinlan's alleged harassment, and that "[Defendant] Quinlan and [Defendant] Rohrman subsequently recommended Plaintiff's termination to [Defendant] Anderson.")  (Id. ¶¶ 31-32.)  Initially, the Court notes that Plaintiff's complaint to Defendant Rohrman regarding Defendant Quinlan's alleged harassment was not protected conduct, and cannot be the basis for Plaintiff's retaliation claim.[11]  However, taken in conjunction with Defendant Rohrman's prior alleged threat to subject Plaintiff to discipline if he continued to make certain complaints, the Court considers this series of events further, if not tenuous, support for Plaintiff's claim.

---

[11]  See supra note 7.

Because Plaintiff has alleged sufficient factual matter to state a § 1983 claim for First Amendment retaliation against Defendant Rohrman, the Court will deny Defendants' Motion to Dismiss that portion of Count I against him in the Amended Complaint.

**B.     Plaintiff's <u>Pierce</u> Claim (Count II)**

Plaintiff alleges that Defendants unlawfully retaliated against him for lodging various work-related complaints, ultimately resulting in his termination, in violation of <u>Pierce v. Ortho Pharmaceutical Corp.</u>, 84 N.J. 58 (1980).  (Compl. ¶ 45.)  As an initial matter, because Plaintiff is only able to maintain a <u>Pierce</u> cause of action against his employer and not against individual employees, the Court will dismiss this claim as to Defendants Quinlan, Rohrman, and Anderson with prejudice.  <u>See</u> <u>O'Lone v. New Jersey Dep't of Corr.</u>, 313 N.J. Super. 249, 256 (App. Div. 1998).

As for Plaintiff's claim against Defendant Board, a <u>Pierce</u> common law wrongful discharge claim allows an at-will employee to sue under a wrongful termination claim when his or her discharge was contrary to a clear mandate of public policy.  To establish a case for common law wrongful discharge, the employee must identify the clear mandate of public policy and that the discharge itself was in violation of that public policy.  <u>Tartaglia v. UBS PaineWebber Inc.</u>, 197 N.J. 81, 109 (2008); <u>MacDougall v. Weichert</u>, 144 N.J. 380, 391 (1996).

With respect the first requirement, that the employee must identify the clear mandate of public policy, the Court's analysis is similar to that of the first prong of a CEPA claim, discussed <u>infra</u> in Part III.C.  <u>See</u> <u>Mehlman v. Mobil Oil Corp.</u>, 153 N.J. 163, 180 (N.J. 1998).  Public policy sources can include "legislation[,] administrative rules, regulations or decisions[,] . . . judicial decisions[, and] [i]n certain instances, a professional code of ethics."  <u>Pierce</u>, 84 N.J. at

72.  Absent legislation, the courts are to define the cause of action in "case-by-case determinations."  Id.

Despite his highly generalized allegations, the Court finds that Plaintiff pled sufficient facts such that it can identify "clear mandates of public policy" that Plaintiff reasonably believed were being violated by certain conduct.  See Mehlman, 153 N.J. at 187, 193 (noting that "the determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law" and stating that individual need not have "[s]pecific knowledge of the precise source of public policy").  For example, Plaintiff complained about the falsification of training records regarding boilers in the school and the illegal dumping of waste, as well as the alleged inappropriate actions of an adult co-worker towards a student.  The Court finds that these allegations implicate public safety and health concerns addressed by federal and state statutes.  See, e.g., the Occupational Health and Safety Act of 1970, 29 U.S.C. §§ 651 et seq., the New Jersey Worker Health and Safety Act, N.J. Stat. Ann. §§ 34:6A-1 et seq., the New Jersey Public Employees' Occupational Safety and Health Act, N.J. Stat. Ann. §§ 34:6A-25 et seq., and the New Jersey Code of Criminal Justice §§ 2C-14-1 et seq.[12]  Additionally, Plaintiff's allegations concerning the illegal dumping of waste and the improper conduct towards a student may also implicate state criminal statutes.  See, e.g., the New Jersey Code of Criminal Justice §§ 2C-14-1 et seq.  And, his complaint that certain employees were performing work without the requisite Black Seal license implicates New Jersey's statutory and regulatory scheme regarding individuals working with boilers.  See N.J. Stat. Ann. §§ 34:7-1 et seq.; N.J. Admin. Code §§

---

[12] The Court notes, however, that Plaintiff's allegation concerning Defendant Quinlan's mismanagement of funds is still too vague for the Court to determine the relevant mandate of public policy or applicable criminal law.  The Court is unable to conclude, without greater specificity, whether "failing to set the schedule of maintenance workers in such a way that reduced the need to continually pay certain workers overtime," rises to the level of fraudulent or criminal activity, or whether it implicates a clear mandate of public policy.  Accordingly, the Court will not inquire into this specific complaint any further.

12:90 et seq.[13]  Thus, Plaintiff has adequately pleaded the first element of his Pierce claim against Defendant Board.

The second Pierce requirement, that Plaintiff's discharge was in violation of the public policy at issue, requires "an expression by the employee of a disagreement with a corporate policy, directive, or decision based on a clear mandate of public policy derived from one of the [public policy] sources . . . identified in Pierce."  Tartaglia, 197 N.J. at 109.  Also required is a "sufficient expression" of that disagreement "to support the conclusion that the resulting discharge violates the mandate of public policy and is wrongful."  Id.  An actual or threatened complaint to an external agency or body is not required, though it would "ordinarily be sufficient means of expression."  Id.  A direct complaint to senior corporate management would also most likely suffice.  Id.  On the other hand, a "passing remark to co-workers" will not, nor will a complaint to an immediate supervisor.  Id.

Here too, Plaintiff has pled sufficient facts to satisfy the second Pierce requirement. Specifically, Plaintiff states that he complained to Defendants Rohrman and Anderson, as well as Human Resources Director Heaton, concerning the alleged falsification of boiler training documents and the illegal waste disposal.  (Compl. ¶¶ 8, 14.)  Thereafter Plaintiff also allegedly reported the falsification of boiler training documents and the illegal waste disposal issues to both the Cape May County Superintendent's Office and the New Jersey Office of Fiscal Accountability and Compliance, (id. ¶ 19), as well as to the "Prosecutor's Office."  (Id. ¶ 21.) Plaintiff claims he also reported the alleged inappropriate actions of his co-worker to Defendants

---

[13] N.J. Admin. Code § 12:90-3.3 (stating that "[a]ny person operating . . . [a]ny steam boiler, steam generator, hot water boiler for service over 250 degrees Fahrenheit" "shall have the appropriate license as specified in [§§] 12:90-3.4 through 3.8."); id. § 12:90-8.3 (stating that a "black seal" license "shall identify a boiler operator"); id. § 12:90-8.4 (setting forth the requirements necessary to be eligible for "a boiler operator's black seal license").

Anderson and Rohrman, (id. ¶ 16), as well as to the Cape May County Prosecutor's Office.  (Id. ¶ 18.)  While it is unclear from the allegations what the specific hierarchy within the school district was, based on Plaintiff's assertions that he complained not only to the Director of Human Resources and a "Business Administrator/Board Secretary," but also to the Superintendent of Wildwood Public Schools, the Court finds that Plaintiff has included allegations sufficient to infer that he made complaints to "senior corporate management," Tartaglia, 197 N.J. 109, such that Plaintiff alleged the "sufficient expression" of disagreement necessary to state a common law claim for wrongful discharge.  Id.  Moreover, Plaintiff has alleged that he complained to an outside prosecutor's office and the Cape May County Superintendent's Office concerning several of the issues he raised, adding further support to his claim that his termination violated a clear mandate of public policy.  Id. at 108.

Because Plaintiff has adequately pled the two requirements for a Pierce claim against Defendant Board, Defendants' Motion to Dismiss will be denied as to Count II against Defendant Board.

### C.    Plaintiff's CEPA Claim (Count III)[14]

In relevant part, CEPA prohibits an employer from "[r]etaliatory action" against an employee who "[o]bjects to, or refuses to participate in any activity, policy, or practice which the employee reasonable believes:  (1) is in violation of a law, or a rule or regulation promulgated

---

[14] Although the parties have not raised this issue, the Court notes that CEPA includes a waiver provision which provides that a plaintiff cannot recover for allegedly retaliatory termination under both CEPA and the common law. See N.J. Stat. Ann. § 34:19-8.  This Court and other district courts have held, however, that a plaintiff does not waive his common law claim by filing a CEPA claim because the decision between a CEPA and common law course of action is to be made after the completion of discovery.  See Brangan v. Ball Plastic Container Corp., No. 11-5470, 2012 WL 1332663, at *6 (D.N.J. Apr. 17, 2012) (stating that "though Plaintiff cannot ultimately proceed under both claims, Plaintiff does not have to make that election at this point in the proceedings"); Broad v. Home Depot U.S.A., Inc., No. 14-771, 2014 WL 1607375, at *3 (D.N.J. Apr. 22, 2014) ("the CEPA waiver does not attach until after the completion of discovery").  Accordingly, the Court's consideration of both Plaintiff's Pierce and CEPA claims is proper.

pursuant to law . . . (2) is fraudulent or criminal . . . or (3) is incompatible with a clear mandate of public policy . . . ."  N.J. Stat. Ann. § 34:19-3(c)(1)-(3).[15]

　　　To state a prima facie case under CEPA, a plaintiff must allege that:  (1) he objected to, or refused to participate in an activity, policy, or practice which he reasonably believed violated either a law, rule, or regulation, was fraudulent or criminal, or violated a public policy; (2) he performed a "whistle-blowing" activity as described in § 34:19-3(c); (3) an adverse employment action was taken against him; and (4) a causal connection existed between his whistle-blowing activity and the adverse employment action.  Dzwonar v. McDevitt, 177 N.J. 451, 462 (N.J. 2003).  Further, when bringing an action under § 34:19-3(c), a plaintiff "must identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct."  Id.  The

---

[15] CEPA explicitly applies liability to "employers" which is defined as:

> any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent and shall include all branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof.

N.J. Stat. Ann. § 34:19-2(a).  This Court has previously held that defendants can be held individually liable under CEPA if they are a "person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent."  Palladino v. VNA of S. N.J., Inc., 68 F. Supp. 2d 455, 474 (D.N.J. 1999); see also Espinosa v. Continental Airlines, 80 F. Supp. 2d 297, 306 (D.N.J. 2000).  "Supervisors are such individuals who act on behalf of the employer with the employer's consent, and are defined by CEPA as:

> any individual with an employer's organization who has the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required under section 7 of this act.

Bowen v. Parking Auth. of City of Camden, No. 00-5765, 2003 WL 22145814, at *22 (D.N.J. Sept. 18, 2003) (citing § 34:19-2(d)).  Here, although Plaintiff seeks to hold Defendants Rohrman and Anderson liable under CEPA, he has not pled that they qualify as supervisors under the Act, nor has he set forth any allegations that make it more plausible than not that they constitute "person[s] or [a] group of persons acting directly or indirectly on behalf of or in the interest of [the Board] with the [Board's] consent."  Palladino, 68 F. Supp. 2d at 474.  As for Defendant Quinlan, although Plaintiff alleges that Defendant Quinlan was his supervisor, and assigned him certain tasks while issuing him Disciplinary Notices for allegedly not completing those tasks, (Compl. ¶¶ 2, 5, 22), he does not allege that Defendant Quinlan acted on behalf of Defendant Board or with the Board's consent.  Nor does Plaintiff allege that Defendants Rohrman, who was the "Business Administrator/Board Secretary," or Defendant Anderson, the Superintendent, were acting on behalf of Defendant Board or with its consent with respect to the few allegations submitted against each of them.  (See id. ¶¶ 17, 20, 28-29, 31-33.)  Accordingly, Plaintiff's CEPA claim will be dismissed as to Defendants Rohrman, Quinlan, and Anderson.

recognized sources of public policy within the ambit of subsection (c)(3) "include state laws, rules and regulations."  Turner v. Associated Humane Societies, Inc., 396 N.J. Super. 582, 593 (App. Div. 2007) (citations omitted).  "Therefore, a plaintiff who pursues a CEPA claim under subsection (c)(3) may rely upon the same laws, rules and regulations that may be the subject of a claim under subsection (c)(1)."  Id. (internal quotation marks, alterations, and citations omitted).[16]

CEPA is remedial legislation, intended to "encourage employees to speak up about unsafe working conditions that violate the law or public policy . . . ."  Donelson v. DuPont Chambers Works, 206 N.J. 243, 255-56 (2011); see also Barratt v. Cushman & Wakefield of N.J., Inc., 144 N.J. 120, 127 (1996).  As such, CEPA should be construed liberally to achieve its goal.  Dzwonar, 177 N.J. at 463.

Plaintiff alleges that he reported practices that "were criminal and/or incompatible with a clear mandate of public policy concerning the public health, safety, welfare or protection of the environment."  (Compl. ¶ 49.)  This conduct included: falsifying boiler training records, and indicating that Plaintiff trained another employee on the procedures for checking the boilers when, in fact, he did not; the mismanagement of funds, vis-à-vis, failing to set the schedule of maintenance workers in such a way that reduced the need to continually pay certain workers

---

[16] Based on Plaintiff's allegation that Defendants violated CEPA by "retaliating against the Plaintiff for reporting conduct which he reasonably believed were criminal and/or incompatible with a clear mandate of public policy concerning the public health, safety, welfare or protection of the environment," the Court construes Plaintiff's CEPA claim as falling under subsections (c)(2) and (c)(3).  Even if the Court walked through an analysis of each CEPA subsection, however, the Court's application of subsection (c), rather than subsections (a) and (b), would still be proper.  Simply, because Plaintiff only alleges misconduct by Defendant Quinlan, his supervisor, and not his employer, subsections (a) and (b) are inapplicable.  See Smith v. TA Operating LLC, No. 10-2563, 2010 WL 3269980, at *4 (D.N.J. Aug. 17, 2010) (citing Higgins v. Pasack Valley Hosp., 158 N.J. 404, 419 (1999) (stating that "the New Jersey Supreme Court found that employees who object to or report the misconduct of a co-worker do not come within the purview of subsections (a) and (b) which limit CEPA's application to policies, practices and activities "of" or "by" the employer")).

overtime; the performance of work by individuals who did not hold Black Seal licenses; the illegal dumping of waste; and inappropriate conduct toward a student.  (Id. ¶¶ 2, 4, 10, 12-13.)

As discussed supra in Part III.B, when viewing the Amended Complaint in the light most favorable to the Plaintiff, the Court finds that Plaintiff adequately pled sufficient facts such that the Court was able to identify "clear mandates of public policy" that Plaintiff reasonably believed was being violated by certain conduct.  See Mehlman, 153 N.J. at 187, 193.  As such, the Court finds that Plaintiff sufficiently alleged the first two elements of a CEPA claim—i.e., that he objected to a practice that he reasonably believed violated a public policy, and performed a whistle-blowing activity by reporting this conduct.  The Court also finds that Plaintiff sufficiently alleged the third element of a CEPA claim by alleging that he was suspended and subsequently terminated from his employment.  See § 34:19-2(e) (adverse employment action includes "suspension" and "termination"); (Compl. ¶¶ 28, 33.)  Finally, the Court will turn to the fourth CEPA element: whether Plaintiff has alleged a causal connection between the whistle-blowing activity and the adverse employment action.

In evaluating whether a causal connection exists, "courts look to correlative federal law to supply the relevant standards for evaluating" a retaliatory discharge claim under New Jersey law.  Morris v. Siemens Components, Inc., 928 F. Supp. 486, 493 (D.N.J. 1996) (citing Abrams v. Lightolier Inc., 50 F.3d 1204, 1212 (3d Cir.1995)).  "Federal courts have held that in order to establish causation, a plaintiff usually must allege either '(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing . . . .'"  Davis v. Supervalu, Inc., No. 13-414, 2013 WL 1704295, at *5 (D.N.J. Apr. 19, 2013) (stating that although the court was presented with the plaintiff's common law wrongful discharge claim on a motion to dismiss, and thus the parties

had not yet had "the opportunity to conduct discovery or establish a record," plaintiff was still required to allege some factual basis to support her claim that she was discharged in violation of public policy <u>because</u> she filed a workers' compensation claim) (citing <u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 297 (3d Cir. 2007)); <u>see also</u> <u>Calabria v. State Operated Sch. Dist. for City of Paterson</u>, No. 06-6256, 2008 WL 3925174, at *6 (D.N.J. Aug. 26, 2008) (in evaluating the causation prong of CEPA, noting that "[t]he Third Circuit has focused on the timing of the retaliatory action and any evidence of ongoing antagonism").

Here, Plaintiff alleges that in 2005, after he complained to Defendant Quinlan about falsification of boiler records, and "in the years following," Defendant Quinlan constantly harassed Plaintiff about his work. (Compl. ¶¶ 2-5, 9.)  Around that time Plaintiff also claims to have reported the falsification of records to Defendants Rohrman and Anderson, but no harassment on their part is alleged. (<u>Id.</u> ¶¶ 6, 8.)[17]  When Plaintiff made new complaints of illegal waste dumping in 2010 at a union meeting and later to Defendant Anderson, he apparently continued to suffer harassment by Defendant Quinlan. (<u>Id.</u> ¶¶ 10-12, 14-15.)  Plaintiff also complained about the inappropriate conduct of a co-worker towards students in 2010. (<u>Id.</u> ¶ 13.) During late 2010 and January 2011 Defendants Anderson and Rohrman purportedly instructed Plaintiff to stop making such complaints, and Defendant Rohrman specifically warned Plaintiff that he would be subject to discipline if he did not cease speaking to others about the allegations against his co-worker. (<u>Id.</u> ¶¶ 16-17, 20.)  Plaintiff also asserts, without any temporal specificity, that he reported his co-worker to the Cape May County Prosecutor's Office, (<u>id.</u> ¶ 18), and reported the falsification of documents and the illegal dumping to the Cape May County

---

[17] Plaintiff generally asserts that he "continued to report the falsification of training documents to others including [Defendant] Anderson." (Compl. ¶ 8.)  While the allegation is ambiguous as to timing, the Court construes this whistle-blowing activity as having occurred around the time or shortly after Plaintiff's original 2005 complaints to Defendants Quinlan and Rohrman, but no later than 2010.

Superintendent's Office, the New Jersey Office of Fiscal Accountability and Compliance, and a prosecutor's office "during this timeframe."  (Id. ¶¶ 19, 21.)

In late 2011, Plaintiff left work for a number of days due to medical issues and in December of that year "advised Defendants that he was unable to report to work due to 'stress induced headaches.'"  (Id. ¶¶ 26-27.)  In response, Defendant Rohrman "forwarded a notice dated December 9, 2011, advising Plaintiff that he was 'suspended with pay . . . pending the results of a fitness for duty evaluation.'"  (Id. ¶ 28.)  When Plaintiff returned to work in December 2011, Defendant Quinlan allegedly continued to harass him, which led Plaintiff to complain to Defendant Rohrman about Defendant Quinlan's ongoing harassment in retaliation for Plaintiff's activities reporting the falsification of documents and illegal wasted dumping.  (Id. ¶¶ 30-31.)  Thereafter, Defendants Quinlan and Rohrman apparently recommended Plaintiff's termination to Defendant Anderson, who in turn recommended Plaintiff's termination to Defendant Board, and Plaintiff was notified by letter dated February 21, 2012, "that he was terminated effective in thirty (30) days."  (Id. ¶¶ 32-33.)

Although Plaintiff pled that he was subjected to two adverse employment actions, he failed to connect these actions to his whistle-blowing activity, which he had concluded by December 2010, one year prior to the first adverse employment action, his December 2011 suspension.  (See id. ¶ 16 (alleging Plaintiff's last whistle-blowing activity associated with a specified date).)  Plaintiff makes general allegations that he was subjected to harassment by Defendant Quinlan, and a conclusory allegation that Defendant Rohrman's involvement in ordering Plaintiff undergo a psychiatric evaluation was in retaliation for certain whistle-blowing activities.  Yet, the absence of temporal proximity between Plaintiff's whistle-blowing activity and his suspension and termination suggests otherwise, and fails to establish the requisite causal

link required to state a prima facie case under CEPA.  Cf. Marracco v. Kuder, No. 08-713, 2008 WL 4192064, at *7 & n.6 (D.N.J. Sept. 9, 2008) (noting that Defendants did not contest that Plaintiff had met element fourth of her CEPA claim where she alleged "that the adverse employment occurred a few days after she voiced her objection to defendant"); O'Keefe v. State, Dept. of Labor, 2007 WL 1975603, at *11 (N.J. Super. Ct. App. Div. July 10, 2007) (finding that demotion of plaintiff a mere twenty-one days after plaintiff reported discriminatory comments supported inference of a causal connection).  There is a possible pattern of antagonism on the part of Defendant Quinlan suggested by the Amended Complaint, but considering the nearly six and one-half year relevant time span, and the generalized nature of Plaintiff's assertions, the Court cannot reasonably infer "antagonism coupled with timing" sufficient to establish causation.  See Davis, 2013 WL 1704295, at *5.  Plaintiff's allegation that he reported Defendant Quinlan's harassment to Defendant Rohrman in December 2011 also cannot save his claim, as such a complaint did not directly implicate a protected activity.  Despite Plaintiff's various amended allegations, he has failed to plead adequate facts consistent with causation to support his CEPA claim.

Accordingly, Defendants' Motion to Dismiss Plaintiff's CEPA claim in the Amended Complaint will be granted, and Count III will be dismissed against all Defendants.

### D.    Plaintiff's NJLAD Claim (Count IV)

Plaintiff alleges that the Board, as well as the individual Defendants, violated the NJLAD.  The Court will first consider Plaintiff's claim against Defendant Board.

#### 1.    Plaintiff's NJLAD Claim against Defendant Board

The NJLAD prohibits an employer from discriminating in the "terms, conditions, or privileges of employment" on the basis of a person's disability, N.J. Stat. Ann. § 10:5-12(a),

29

"unless the handicap precludes the performance of employment." Failla v. City of Passaic, 146 F.3d 149, 153 (3d Cir.1998) (citing § 10:5-4.1).  To state a prima facie cause of action for disability discrimination under the NJLAD, the employee must allege (1) that he was handicapped, (2) that he was otherwise qualified to perform the essential functions of the job, with or without the accommodation by the employer, and was performing at a level that met the employer's expectations, (3) that he nevertheless was fired, and (4) that the employer sought someone to perform the same work after he left. Dicino v. Aetna U.S. Healthcare, No. 01-3206, 2003 WL 21501818, at *12 (D.N.J. June 23, 2003) (citing Muller v. Exxon Research & Eng'g Co., 345 N.J. Super. 595, 602 (App. Div. 2001)).

Plaintiff has added a bare recitation of the NJLAD elements articulated by the Court in its prior Opinion in an attempt to "cure the problems noted by [this] Court." (Pl.'s Br. at 26.)  He alleges that he suffered from hypertension, of which Defendants were supposedly aware, (Compl. ¶ 54), that he was able to perform all the duties required by his job despite his medical condition, in a manner which would meet the reasonable requirements of any employer, (id. ¶¶ 55-56), that he was terminated by Defendants because of his disability, (id. ¶ 58), and the following his termination, Defendants hired another custodian to replace Plaintiff and perform all of his same duties.  (Id. ¶ 59.)

Despite Plaintiff's inclusion of the elements missing from his prior Complaint, Plaintiff has not pled factual matter to support the elements of his NJLAD claim.  With respect to his purported hypertension, Plaintiff claims that his high blood pressure was "visibly apparent from the sudden change in Plaintiff's physical appearance" but he has not specified to whom it was apparent.  (Id. ¶ 24.)  While Plaintiff did alert Defendants that he was seeking a short medical leave, according to Plaintiff's own allegations he actually advised Defendants that he was

suffering from "stress-induced headaches." (Id. ¶ 27.)  Plaintiff goes on to allege that Defendant

Rohrman's involvement in directing that Plaintiff undergo a psychiatric evaluation was only,

with relevance to this claim, "in retaliation for requesting a brief medical leave of absence." (Id.

¶ 29.)  It is even less clear from the Amended Complaint that Plaintiff's termination was in any

way related to his alleged actual or perceived disability.  Rather, the paragraphs preceding the

description of his termination notice pay particular attention to the retaliatory motive of

Defendant Quinlan, based on Plaintiff's prior reports of falsified training documents and illegal

waste disposal issues.  (See id. ¶¶ 30-33.)  Though the Court must take Plaintiff's facts as true for

purposes of a motion to dismiss and make reasonable inferences in his favor, the Court is not

required to read facts into Plaintiff's Amended Complaint that simply do not exist and are

necessary for purposes of stating a claim under the NJLAD.  Plaintiff still bears the burden of

stating his claim in a way that makes it more plausible than not that he was discriminated against

on account of his alleged disability.  Here there is no factual support, other than Plaintiff's legal

conclusions, that Defendant Board terminated, or otherwise discriminated or failed to

accommodate Plaintiff, based on his disability.

Moreover, Plaintiff's mere recital of the remaining elements of his NJLAD claim are

insufficient to survive a motion to dismiss.  Plaintiff gives no factual support for the legal

conclusions that he was "treated differently than other custodians and subject to disparate

treatment on the basis of his disability or perceived disability," (id. ¶ 53), or that he was

performing his work at a level that met his employers expectations, "in an acceptable manner

which would meet the reasonably requirement of any employer."  (Id. ¶ 57.)  "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).

Based on the foregoing, Defendants' Motion to Dismiss Plaintiff's NJLAD claim against Defendant Board will be granted.

### 2.    Plaintiff's NJLAD Claim against the Individual Defendants

Because the NJLAD "imposes liability only on 'employers' and not on individual employees . . . the only way for an employee to be found individually liable under the NJLAD is if he is involved in aiding or abetting an employer's discriminatory conduct . . . .  Accordingly, while an employee cannot be held individually liable on his own, '[e]mployers and individual supervisors can be held liable under the [NJLAD] for aiding and abetting another's [ ] discriminatory conduct.'"  Horvath v. Rimtec Corp., 102 F. Supp. 2d 219, 228 (D.N.J. 2000) (citing Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 126 (3d Cir. 1999)).

Plaintiff must establish three elements for an aiding and abetting claim under the NJLAD: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."  Hurley, 174 F.3d at 127 (citations omitted).

Just as this Court held in its prior Opinion, because Plaintiff has failed to set forth any allegations in his Amended Complaint that make it more plausible than not that Defendants Anderson, Rohrman, and Quinlan could be held liable under the NJLAD for aiding and abetting Defendant Board's conduct—indeed, the terms "aiding," "abetting," and "conspiracy," are notably absent from Plaintiff's Amended Complaint—the Court will also grant Defendants' Motion to Dismiss Plaintiff's NJLAD claim as to the individual Defendants.  Accordingly, Count IV of Plaintiff's Amended Complaint will be dismissed as to all Defendants.

### E. Leave to Amend

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." Phillips, 515 F.3d at 245 (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)).  Indeed, even when "a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

Because the Court finds that Plaintiff may be able to cure the pleading deficiencies identified above such that amendment would not be futile, the Court will grant Plaintiff the opportunity to seek leave to amend his Amended Complaint within fourteen days of the date of this Opinion and accompanying Order.[18, 19] Cf. Hartman v. Twp. of Readington, No. 02-2017,

---

[18] However, as noted supra at Part III.B, the Court will not grant leave to amend Plaintiff's Pierce claim against the individual Defendants.

[19] If Plaintiff files a Motion for Leave to Amend the Amended Complaint, he shall attach to the Motion a copy of the proposed Second Amended Complaint, as required by Loc. Civ. R. 7.1(f).

2006 WL 3485995, at *3 (D.N.J. Nov. 30, 2006) ("Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile").

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss will be **GRANTED IN PART** and **DENIED IN PART**.  An appropriate Order shall issue today.


Dated:  _12/23/2014__                                            _s/ Robert B. Kugler___
                                                                  ROBERT B. KUGLER
                                                                  United States District Judge