IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| LANCE BOBO, | : | |
| Plaintiff, | : | Civil No. 13-5007 (RBK/KMW) |
| v. | : | **OPINION** |
| WILDWOOD PUBLIC SCHOOLS BOARD OF EDUCATION, et al. | : | |
| Defendants. | : | |

**KUGLER**, United States District Judge:

Lance Bobo ("Plaintiff") brings claims for violations of his civil rights under section 1983, conspiracy to violate his rights pursuant to section 1985, retaliation, violations of the New Jersey Conscientious Employee Protection Act ("CEPA"), and violations of the New Jersey Law Against Discrimination ("NJLAD") against the Wildwood Public Schools Board of Education, Gregory Rohrman, Dennis Anderson, Patrick Quinlan, and five John Doe decisionmakers ("Defendants"). This matter comes before the Court upon Defendants' Motion for Summary Judgment (Doc. No. 59) on Plaintiff's 1983 claims against Defendants Quinlan and Rohrman and Plaintiff's wrongful discharge claim against the Board of Education. For the following reasons, Defendants' motion is **GRANTED**.

1

## I. FACTUAL BACKGROUND[1]

The facts, in the light most favorable to the Plaintiff, are as follows: Plaintiff was employed by the Wildwood Board of Education ("the Board") as a custodian from July 20, 2005 until February 15, 2012. Defs.' Statement ¶ 11; Pl.'s Resp. ¶ 11. Defendant Patrick Quinlan ("Quinlan") has been the supervisor of buildings and grounds for the board since July 1, 2004. Defs.' Statement ¶ 12; Pl.'s Resp. ¶ 12. Quinlan supervised all custodians employed by the Board, and was Plaintiff's direct supervisor during his employment. Defs.' Statement ¶¶ 13-14; Pl.'s Resp. ¶¶ 13-14. Defendant Gregory Rohrman ("Rohrman"), the Board's Business Administrator was Quinlan's direct supervisor. Defs.' Statement ¶ 15; Pl.'s Resp. ¶ 15.

Plaintiff made employment-related complaints in a number of areas during his tenure. Defs.' Statement ¶ 18; Pl.'s Resp. ¶ 18. These complaints regarded: 1) false boiler logs; 2) illegal dumping of chemicals and waste; 3) mismanagement of taxpayer money; 4) inappropriate behavior towards students by David Lee; and 5) the fact that some custodians lacked a "necessary" Black Seal license.[2] Plaintiff's Statement of Material Facts Not in Dispute ("Pl.'s Statement") ¶ 2 (Doc. No. 62).[3] Plaintiff was employed on a yearly contractual basis, and his employment was renewed continually from 2005 through the 2011-12 school years. Defs.' Statement ¶¶ 20-21; Pl.'s Resp. ¶¶ 20-21.

---

1. The Court notes from the outset that Plaintiff frequently responds to statements in Defendants' Statement of Undisputed Material Facts ("Defs.' Statement") (Doc. No. 56-1) with "[n]either admitted nor denied." *See* Plaintiff's Amended Response to Defendant's R.56.1 Statement ("Pl.'s Resp.") (Doc. No. 69). When parties attempt to dispute (or fail to dispute) a fact asserted and supported from the record without supporting their position with a citation to the record, such assertions are insufficient to create an actual dispute of fact. The Court will regard these paragraphs as undisputed for purposes of this Motion. *See Juster Acquisition Co., v. N. Hudson Sewerage Auth.*, No. 12-3427, 2014 WL 268652, at *5 n.4 (D.N.J. Jan. 23, 2014) ("[A]ny statement that is not explicitly denied with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted.").
2. Plaintiff apparently complained that some custodians did not hold a "required" Black Seal license to work with the boilers. Pl.'s Statement ¶ 2. However, it appears that the Black Seal license was not exactly "required" based on emails between school administrators. *See* McFadden Certification ("McFadden Cert."), Ex. E (Doc. No. 61-6).
3. The Court notes that Defendants did not respond to Plaintiff's Statement of Material Facts Not in Dispute. The Court will regard these paragraphs as undisputed for the purposes of this Motion to the extent that Defendant's Statement of Material Facts Not in Dispute does not contradict facts in Plaintiff's statement.

Plaintiff made a number of verbal complaints to Quinlan alleging that employees were falsifying boiler logs to indicate they were receiving training towards Black Seal licensure. Defs.' Statement ¶¶ 22-23; Pl.'s Resp. ¶¶ 22-23. It is unclear when Plaintiff originally informed Quinlan of this alleged issue (Plaintiff states that he first complained in 2004-05; Quinlan claims he had never heard complaints from any employee regarding the boiler logs before 2010). Defs.' Statement ¶¶ 24-26; Pl.'s Resp. ¶¶ 24-26. There is, however, no dispute that there is no evidence that Quinlan discussed the boiler logs in any way with his supervisor, the Board, or anyone else. Defs.' Statement ¶ 32; Pl.'s Resp. ¶ 32. Plaintiff claims that he once told Defendant Rohrman about this issue on the phone in 2010, and "might" have brought up the boiler logs in a meeting with Rohrman in 2010 or 2011. Defs.' Statement ¶¶ 33-34; Pl.'s Resp. ¶¶ 33-34. It is undisputed that Plaintiff did not otherwise discuss the boiler logs with Rohrman or the Board. Defs.' Statement ¶ 35; Pl.'s Resp. ¶ 35.

Plaintiff also alleges that he made verbal complaints to Defendant Quinlan each year about other employees illegally dumping chemical waste. Defs.' Statement ¶¶ 37-38; Pl.'s Resp. ¶¶ 37-38. Plaintiff may have also brought up illegal dumping in a phone conversation with Defendant Rohrman in 2009 or 2010. Defs.' Statement ¶ 38; Pl.'s Resp. ¶ 38. Plaintiff did not submit any written complaints regarding alleged illegal dumping. Defs.' Statement ¶ 40; Pl.'s Resp. ¶ 40.

Plaintiff also contends that statements he made in a union meeting may have been a basis for his termination. Plaintiff complained in said meeting that the Board was mismanaging taxpayer money by failing to reduce the amount of overtime incurred by maintenance workers. Pl.'s Statement ¶ 2. Defendant Rohrman mentions Plaintiff's complaints regarding other employees' work habits in his fax to Dr. Glass. *Id.*

Plaintiff also made numerous complaints regarding David Lee ("Lee"), another custodian at the high school. Plaintiff spoke to the school's principal, Christopher Armstrong, on July 26, 2010 to report that he had seen Lee sniff a cheerleader. Defs.' Statement ¶ 44; Pl.'s Resp. ¶ 44. This alleged incident occurred in November 2009, but Plaintiff did not tell anyone until July 2010 immediately after an argument with Lee regarding the way Lee stripped the gym floor. Defs.' Statement ¶¶ 45, 52, 92; Pl.'s Resp. ¶¶ 45, 52, 92. Plaintiff also alleged that he saw Lee touch a female basketball player in "an affectionate way" in December 2009. Defs.' Statement ¶ 47; Pl.'s Resp. ¶ 47. Armstrong asked Plaintiff to submit written statements regarding the allegations, which Plaintiff did on July 29, 2010. Defs.' Statement ¶¶ 49-50; Pl.'s Resp. ¶¶ 49-50.

Plaintiff's statement regarding the November 2009 incident claimed that he saw Lee pretend to pick up a pen cap before he "sniffed the back of this girl from her ankles to her shoulders, then walked away." Defs.' Statement ¶ 53; Pl.'s Resp. ¶ 53. Plaintiff claims that Lee called his action "an old trick." Defs.' Statement ¶ 53; Pl.'s Resp. ¶ 53.

Plaintiff's second written statement details a "January, February 2010" incident in which Lee allegedly put his hands on a cheerleader's shoulders. Defs.' Statement ¶¶ 58-61; Pl.'s Resp. ¶¶ 58-61. Lee allegedly "came up behind" the young woman and "started rubbing her neck and shoulders," causing her to shiver and shake. Defs.' Statement ¶ 61; Pl.'s Resp. ¶ 61. Plaintiff's statement also explained that he did not tell anyone of this incident because he did not want to be accused of lying about it. Defs.' Statement ¶ 60; Pl.'s Resp. ¶ 60. Plaintiff, however, claims that he verbally informed Quinlan and McCarthy (the school's Affirmative Action Officer). Defs.' Statement ¶ 62; Pl.'s Resp. ¶ 62.

Plaintiff also described other alleged incidents involving Lee during his deposition. Plaintiff alleges that he saw Lee touch a basketball player inappropriately on her shoulder in February 2010. Defs.' Statement ¶ 63; Pl.'s Resp. ¶ 63. Plaintiff did not make a written statement regarding this incident, though he claims he verbally informed Defendant Quinlan and Carol Ann MacDonald (the Union President). Defs.' Statement ¶ 65; Pl.'s Resp. ¶ 65. Plaintiff further claims that Quinlan once told him that Lee was "always standing around staring at the girls" during cheerleading practice. Defs.' Statement ¶ 66; Pl.'s Resp. ¶ 66.

Defendant Quinlan has testified that he immediately escalated Plaintiff's allegations regarding Lee to the Superintendent, Dennis Anderson, for the school district to investigate. Defs.' Statement ¶¶ 68-71; Pl.'s Resp. ¶¶ 68-71. Quinlan sent Lee to speak with McCarthy (the Affirmative Action Officer) after Lee reported Plaintiff making disparaging comments about him. Defs.' Statement ¶ 73; Pl.'s Resp. ¶ 73. McCarthy learned that Plaintiff had issues with Lee from the time that Plaintiff began working at Wildwood. Defs.' Statement ¶ 76; Pl.'s Resp. ¶ 76. McCarthy concluded that he could not determine what actually occurred in the incidents, in part because Plaintiff reported them more than five months after they allegedly occurred. Defs.' Statement ¶ 80, 83; Pl.'s Resp. ¶¶ 80, 83. McCarthy also noted that no student ever reported inappropriate behavior by Lee. Defs.' Statement ¶ 81; Pl.'s Resp. ¶ 81.

Plaintiff contends that McCarthy could have determined what happened because all witnesses were still available. Pl.'s Resp. ¶ 80. Plaintiff also argues that McCarthy's determination was inaccurate because he misrepresented the information provided by Patrick Rudden (another custodian). Pl.'s Resp. ¶ 83. Mr. Rudden certified that believed Lee had acted inappropriately in the November 2009 incident, despite McCarthy's representation that Rudden did not judge Lee's actions to be inappropriate. Rudden Certification ¶ 7-10 (Doc No. 61-10).

Superintendent Anderson scheduled a meeting with Plaintiff to discuss Plaintiff's allegations. Defs.' Statement ¶ 84; Pl.'s Resp. ¶ 84. Plaintiff actually met with the Superintendent on August 13, 2010. Defs.' Statement ¶ 85; Pl.'s Resp. ¶ 85. The meeting was documented in a letter, which details the school district's displeasure with Plaintiff's unacceptable decision to not report the alleged incidents immediately. Defs.' Statement ¶ 86-87; Pl.'s Resp. ¶ 86-87. The letter also noted Plaintiff's slanderous comments, accusations, and threats against Lee. Defs.' Statement ¶ 88; Pl.'s Resp. ¶ 88. Anderson informed Plaintiff that he should immediately "cease and desist" his comments about Lee; continued comments, threats, etc. would lead to "disciplinary actions." Defs.' Statement ¶¶ 89-90; Pl.'s Resp. ¶¶ 89-90.

Plaintiff was transferred from Wildwood High School to the Glenwood Avenue Elementary School at the beginning of the 2010-11 school year. Defs.' Statement ¶ 93; Pl.'s Resp. ¶ 93. Plaintiff claims that he was transferred after making a verbal complaint about Lee which he did not submit in writing. Defs.' Statement ¶¶ 94-96; Pl.'s Resp. ¶¶ 94-96. McCarthy informed Superintendent Anderson of new complaints from Lee regarding Plaintiff on September 24, 2010. Defs.' Statement ¶ 98; Pl.'s Resp. ¶ 98. Lee informed McCarthy that he had learned of a County Prosecutor's Office investigation into Plaintiff's allegations. Defs.' Statement ¶ 99; Pl.'s Resp. ¶ 99. Lee had also heard that Plaintiff was informing people that a pedophile worked at the school and that Superintendent Anderson was "the head of a pedophile ring." Defs.' Statement ¶¶ 100-01; Pl.'s Resp. ¶¶ 100-01.

Defendant Rohrman wrote to Plaintiff on December 20, 2010 to request a meeting. Defs.' Statement ¶ 102; Pl.'s Resp. ¶ 102. The content of their December 22, 2010 meeting was memorialized in a letter from Rohrman to Plaintiff on January 5, 2011. Defs.' Statement ¶ 103; Pl.'s Resp. ¶ 103. The letter detailed reports Rohrman received that Plaintiff was continuing his

negative comments regarding Lee. Defs.' Statement ¶ 104; Pl.'s Resp. ¶ 104. Rohrman asked Plaintiff if he had new evidence to corroborate his accusations. Defs.' Statement ¶ 105; Pl.'s Resp. ¶ 105. Defendants claim that Plaintiff pointed only to Rudden (which was not new information), though Plaintiff argues that Defendants mischaracterized and ignored Rudden's statements. Defs.' Statement ¶ 105; Pl.'s Resp. ¶ 105. Plaintiff made a new accusation during this meeting; he claimed that he saw Lee "smelling teacher's chair in the evening" and "gawking" at female students during school dances. Defs.' Statement ¶ 106; Pl.'s Resp. ¶ 106. Plaintiff testified that he saw Lee smell a chair in summer of 2007, though there is no record of Plaintiff reporting this incident before the December 22, 2010 meeting. Defs.' Statement ¶¶ 107-08; Pl.'s Resp. ¶¶ 107-08. Plaintiff later testified that he made a verbal complaint regarding this incident to Rohrman in 2007. Defs.' Statement ¶ 109; Pl.'s Resp. ¶ 109. Rohrman's letter went on to inform Plaintiff that the District and Prosecutor's Office both concluded that there was no cause of action against Lee. Defs.' Statement ¶ 110; Pl.'s Resp. ¶ 110. Plaintiff was reminded that he had previously been told to stop making accusations against Lee, and was informed that further disparagement would subject him to disciplinary actions. Defs.' Statement ¶¶ 111-14; Pl.'s Resp. ¶¶ 111-14.

On or about December 2, 2011, Defendant Quinlan became aware of an issue with Plaintiff's work. Defs.' Statement ¶ 118; Pl.'s Resp. ¶ 118. Quinlan heard that Plaintiff was not properly cleaning his assigned area. Defs.' Statement ¶ 121; Pl.'s Resp. ¶ 121. Quinlan spoke with Plaintiff about the specific areas he needed to clean; Plaintiff claimed that he "didn't get to it." Defs.' Statement ¶ 123; Pl.'s Resp. ¶ 123. When Quinlan observed Plaintiff's assigned area over the next few days, he observed that Plaintiff had clearly not cleaned the area (including visible spills in the hallway from days earlier). Defs.' Statement ¶ 124; Pl.'s Resp. ¶ 124;

Defendants' Exhibit CC at 2 (Doc. No. 44-4). Quinlan wrote up a Disciplinary Action Report regarding Plaintiff's failure to do his work on December 7, 2011, noting that portions of Plaintiff's area appeared as though they "were not touched," despite verbal instructions to clean specific things. Defs.' Statement ¶¶ 116-17; Pl.'s Resp. ¶¶ 116-17. Plaintiff contended that he was unable to complete the amount of work required during his shift. Defs.' Statement ¶ 125; Pl.'s Resp. ¶ 125. Plaintiff however, admits that his work load at Glenwood Avenue was equal to his work load at Wildwood High. Defs.' Statement ¶ 97; Pl.'s Resp. ¶ 97.

On December 9, 2011 Rohrman wrote to Plaintiff requiring him to attend a fitness for duty evaluation due to Plaintiff's behavior and claims that he was unable to come to work. Defs.' Statement ¶ 126; Pl.'s Resp. ¶ 126. The Board sent an additional letter to the same effect on December 13, 2011. Defs.' Statement ¶ 128; Pl.'s Resp. ¶ 128. The District required Plaintiff to make an appointment with a licensed therapist per the examining psychiatrist's recommendation as a condition of continued employment on January 6, 2012. Defs.' Statement ¶¶ 129-30; Pl.'s Resp. ¶¶ 129-30.

Quinlan authored two more memoranda regarding Plaintiff's work performance on January 21, 2012 and January 24, 2012. Defs.' Statement ¶¶ 131, 133; Pl.'s Resp. ¶¶ 131, 133. The January 21 memorandum observed that Plaintiff's cleaning log indicated that he had cleaned areas that, upon visual inspection, had clearly not been touched. Defs.' Statement ¶ 132; Pl.'s Resp. ¶ 132. The January 24 memorandum documented Quinlan's verbal warning to Plaintiff regarding his job performance. Defs.' Statement ¶ 134; Pl.'s Resp. ¶ 134. When Quinlan inspected Plaintiff's areas on January 25, 2012, he found "zero effort of improvement in the cleanliness of [the] assigned rooms." Defs.' Statement ¶ 135; Pl.'s Resp. ¶ 135. Quinlan issued Plaintiff a second Discipline Action Report for failure to clean his assigned areas on January 25,

2012. Defs.' Statement ¶¶ 138-39; Pl.'s Resp. ¶¶ 138-39. Quinlan gave this second report to his superiors, but there is no evidence that he made any recommendations to the Board or a supervisor regarding Plaintiff. Defs.' Statement ¶¶ 140, 148-50; Pl.'s Resp. ¶¶ 140, 148-50.

Plaintiff continued making comments and accusations regarding Lee after his second Disciplinary Action Report. Lee informed Quinlan on January 27, 2012 that another custodian informed a teacher "that one of the custodians in the [high school] is a pedophile and child molester." Defs.' Statement ¶¶ 151-52; Pl.'s Resp. ¶¶ 151-52. Lee contacted Affirmative Action Officer McCarthy on January 30, 2012 to report that Plaintiff had been "talking about 'someone' being a pedophile." Defs.' Statement ¶¶ 154-55; Pl.'s Resp. ¶¶ 154-55. Lee wrote a letter to the District on January 30, 2012. Defs.' Statement ¶ 157; Pl.'s Resp. ¶ 157. Lee stated that he wrote "out of concern for [his] well being," explaining that he "feel[s] unsafe being in the same area" as Plaintiff. Defendants' Exhibit X (Doc. No. 43-3).

That same day, Rohrman sent Plaintiff a letter on behalf of the District stating that Plaintiff was suspended for repeated acts of insubordination. Defs.' Statement ¶ 160; Pl.'s Resp. ¶ 160. The letter cites Plaintiff's disciplinary reports related to his work performance, previous written instructions to desist harassing Lee, and recent, credible reports that Plaintiff continued disparaging Lee as acts of insubordination. Defs.' Statement ¶¶ 161-65; Pl.'s Resp. ¶¶ 161-65. The letter further explained that Plaintiff would be suspended until the Board met on February 15, 2012 to discuss Plaintiff's employment. Defs.' Statement ¶ 166; Pl.'s Resp. ¶ 166.

When the Board met on February 15, 2012, they discussed Plaintiff's behavior in an executive session before hearing from Plaintiff and his attorney. Defs.' Statement ¶¶ 180, 182; Pl.'s Resp. ¶¶ 180, 182. The Board voted to terminate Plaintiff's employment for gross insubordination. Defs.' Statement ¶¶ 183-84; Pl.'s Resp. ¶¶ 183-84. The Board sent Plaintiff a

letter explaining their decision; the letter cited Plaintiff's delayed reports of allegations regarding Lee, Plaintiff's continued accusations/harassment of Lee after investigations failed to corroborate the accusations, and Plaintiff's failure to complete his work as examples of insubordination. Defs.' Statement ¶¶ 185-86; Pl.'s Resp. ¶¶ 185-86.

Plaintiff filed the instant action in Superior Court on February 20, 2013. Complaint (Doc. No. 1-1). Defendants removed the case to this Court on August 21, 2013. Notice of Removal (Doc. No. 1). Plaintiff's First Amended Complaint was filed on June 10, 2014. (Doc. No. 7). The instant motion for summary judgment was filed on November 18, 2016.

## II. STANDARD

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Id.* at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in her favor. *Id.* at 255.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. Furthermore, the nonmoving may not simply allege facts, but instead must "identify those facts of record which would contradict the facts identified by the movant." *Port Auth. of N.Y. and N.J.*

*v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002). The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. Section 1983 Claim

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001). In order to properly state a First Amendment retaliation claim, "a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). "The first factor is a question of law; the second factor is a question of fact." *Id.* at 241. A plaintiff can prove that his speech was protected activity by showing that: (1) in making it, Plaintiff spoke as a citizen, (2) the statement involved a matter of public concern, and (3) Plaintiff's employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made under the *Pickering* test. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

In order to prove that the protected activity was a substantial factor in the alleged retaliatory action, the Plaintiff must show two things: 1) Defendants' action(s) were "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights . . ."; and 2) that Plaintiff's protected activity was a "substantial factor in causing this conduct." *Revell v. City of Jersey City*, 394 F. App'x 903, 905-06 (3d Cir. 2010) (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)). The Third Circuit has observed that "[c]ourts have declined to find adverse

action where the 'alleged retaliatory acts were criticism, false accusations or verbal reprimands."
*Revell*, 394 F. App'x at 906 (quoting *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003)). Assuming *arguendo* that Plaintiff's allegations regarding Lee were protected speech, the Court finds that no reasonable jury could determine that Defendants Quinlan and Rohrman's actions were sufficient to deter a person of ordinary firmness from exercising their First Amendment rights. The record contains instances of verbal reprimands (memorialized in letters) from Defendant Quinlan to Plaintiff, but the only documented official reprimands were related to Plaintiff's inadequate job performance. Defendant Rohrman's only apparent action against Plaintiff was requiring Plaintiff to undergo a fitness evaluation, which was premised on Plaintiff's claim that he was unable to do his work. Therefore, the Court finds that Plaintiff has not shown that any actions by Quinlan or Rohrman related to his allegedly protected speech were sufficient to deter a person of ordinary firmness from exercising their First Amendment rights.

Furthermore, Plaintiff has failed to establish that his protected speech was a substantial factor related to his termination. "To establish a requisite causal connection, a plaintiff usually must establish either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Revell*, 394 F. App'x at 906 (quoting *Lauren W. ex rel Jean W. v. DeFlaminis*, 480 F.3d 259, 259 (3d Cir. 2007)). The record clearly demonstrates that Plaintiff made allegations regarding Lee over the course of many years. Defendant Quinlan's first Disciplinary Action Report issued on December 7, 2011 came almost a year after the District last received reports of Plaintiff making allegations about Lee. Quinlan's second Disciplinary Action Report regarding Plaintiff's work performance was issued on January 25, 2012. Lee reported new comments and accusations by Plaintiff on January 27, 2012. The Court finds that no

reasonable jury could find that there was adequate temporal proximity between Plaintiff's allegedly protected speech and Quinlan's Disciplinary Action Reports to establish a causal link between Plaintiff's speech and a retaliatory action. Therefore, because Plaintiff has failed to establish that Defendants' actions were sufficient to deter a person of ordinary firmness from exercising their First Amendment rights and because Plaintiff has failed to establish a requisite causal connection between his allegedly protected speech and Defendants' actions, Defendants' motion for summary judgment is granted as to Plaintiff's section 1983 claims.

### B. Wrongful Discharge

To establish a wrongful discharge claim under New Jersey law, a plaintiff must (1) identify a clear mandate of public policy violated by his termination; (2) allege that he made complaints about, or refused to participate in, conduct by defendants that violated that public policy; and (3) establish that he was discharged in retaliation for opposing the conduct of defendants that violated the public policy at issue. *See Pierce v. Ortho Pharm. Corp.*, 84 N.J. 58, 72-73 (1980).

Defendants argue, and the Court agrees, that the record is devoid of any evidence that the Board was aware of any of Plaintiff's complaints regarding falsified boiler logs or illegal dumping. Defs.' Br. at 28-30 (Doc. No. 56). Therefore, Plaintiff's claim must be based upon his allegations and complaints regarding Lee. Defendants argue that Plaintiff's disagreement with the conclusion of the Board and the County Prosecutor's Office regarding his allegations against Lee are not a clear mandate of public policy. *Id.* at 30. Plaintiff responds that he was free to continue voicing his opinion regarding Lee since the investigation into his allegations was inconclusive. Pl.'s Resp. Br. at 34 (Doc. No. 61). The Court observes that the record is devoid of any evidence that the Board's conduct regarding Plaintiff's allegations violated a mandate of public policy. Plaintiff's complaints regarded allegedly illegal conduct by Lee, not the Board.

13

There is nothing in the record to suggest that the Board violated a mandate of public policy in the way it investigated Plaintiff's allegations against Lee. Therefore, the Court finds that no reasonable jury could conclude that Plaintiff was discharged in retaliation for opposing the conduct of the Board that violated the public policy at issue. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's wrongful discharge claim.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**.


Dated: 04/20/2017                                                 s/ Robert B. Kugler
                                                                                     ROBERT B. KUGLER
                                                                                     United States District Judge